134 F.3d 245
 Daniel G. BUONOCORE, Plaintiff-Appellant,
v.
Donald L. HARRIS, Special Agent, Bureau of Alcohol, Tobacco,
and Firearms; David R. Cundiff, Deputy Sheriff,
Franklin County Sheriff's Department;
United States of America,
Defendants-Appellees,
and
Chesapeake & Potomac Telephone Company of Virginia; James
D. Thompson, Assistant Manager, Chesapeake and
Potomac Telephone Company of Virginia;
Linda Sue Taylor, Defendants.
Daniel G. BUONOCORE, Plaintiff-Appellee,
v.
Donald L. HARRIS, Special Agent, Bureau of Alcohol, Tobacco,
and Firearms, Defendant-Appellant,
and
David R. Cundiff, Deputy Sheriff, Franklin County Sheriff's
Department; Chesapeake & Potomac Telephone Company of
Virginia; James D. Thompson, Assistant Manager, Chesapeake
and Potomac Telephone Company of Virginia; Linda Sue
Taylor; United States of America, Defendants.
Daniel G. BUONOCORE, Plaintiff-Appellee,
v.
David R. CUNDIFF, Deputy Sheriff, Franklin County Sheriff's
Department, Defendant-Appellant,
and
Donald L. Harris, Special Agent, Bureau of Alcohol, Tobacco,
and Firearms; Chesapeake & Potomac Telephone Company of
Virginia; James D. Thompson, Assistant Manager, Chesapeake
and Potomac Telephone Company of Virginia; Linda Sue
Taylor; United States of America, Defendants.
 Nos. 96-1847, 96-1984 and 96-1986.
 United States Court of Appeals,
Fourth Circuit.
 Argued Oct. 31, 1997.
Decided Jan. 14, 1998.
 
 ARGUED: John Thomas Boitnott, Rock Mount, VA, for Appellant. Elizabeth Kay Dillon, Woods, Rogers & Hazlegrove, Roanoke, VA, for Appellee Cundiff; Richard Albert Lloret, Office of the United States Attorney, Abingdon, VA, for Appellees Harris and United States. ON BRIEF: Terry N. Grimes, King, Fulghum, Snead, Nixon & Grimes, P.C., Roanoke, VA, for Appellant. Robert P. Crouch, Jr., Office of the United States Attorney, Abingdon, VA, for Appellees Harris and United States.
 Before HAMILTON, WILLIAMS, and MOTZ, Circuit Judges.
 Affirmed by published opinion. Judge DIANA GRIBBON MOTZ wrote the opinion, in which Judge HAMILTON joined. Judge WILLIAMS wrote a concurring opinion.
 OPINION
 DIANA GRIBBON MOTZ, Circuit Judge:
 
 
 1
 A homeowner, Daniel G. Buonocore, filed this action, alleging that two law enforcement officers, Donald L. Harris and David R. Cundiff, violated his Fourth Amendment rights when, after obtaining a warrant to search Buonocore's home for illegal weapons, they invited a private person to engage in an independent search of the home for items never mentioned in the warrant.
 
 
 2
 The district court refused to grant the officers summary judgment on qualified immunity grounds, reasoning that material factual disputes as to the officers' conduct presented "triable issues." On appeal, we held that Buonocore had alleged the violation of clearly established Fourth Amendment rights, explaining:
 
 
 3
 the Fourth Amendment prohibits government agents from allowing a search warrant to be used to facilitate a private individual's independent search of another's home for items unrelated to those specified in the warrant. Such a search is not "reasonable." It obviously exceeds the scope of the required specific warrant and furthermore violates the "sanctity of private dwellings."
 
 
 4
 Buonocore v. Harris, 65 F.3d 347, 356 (4th Cir.1995) (quoting United States v. Martinez-Fuerte, 428 U.S. 543, 561, 96 S.Ct. 3074, 3084, 49 L.Ed.2d 1116 (1976)). However, we further held that the officers could not appeal "the district court's summary judgment order insofar as that order determine[d] whether or not the pretrial record sets forth a 'genuine' issue of fact for trial." Id. at 360 (quoting Johnson v. Jones, 515 U.S. 304, 319-320, 115 S.Ct. 2151, 2159, 132 L.Ed.2d 238 (1995)). Accordingly, we dismissed the appeal. Id.
 
 
 5
 The case was then tried by a jury, which returned a special verdict finding that Harris had not violated Buonocore's Fourth Amendment rights but that Cundiff had, entitling Buonocore to an award of $8,500 in damages from Cundiff. All parties appeal. For the reasons set forth within, we affirm.
 
 I.
 
 6
 The evidence at trial disclosed the following facts.
 
 
 7
 The officers searched Buonocore's home on November 24, 1992. For two years prior to that search, Buonocore lived with Linda Sue Taylor. In early November, 1992, following a quarrel, Taylor moved out of Buonocore's house and contacted Cundiff, a local deputy sheriff. At this meeting and one that followed shortly thereafter, Taylor told Deputy Cundiff that she had seen in Buonocore's house equipment that he had stolen from his employer, the C & P Telephone Company, and illegal and unregistered firearms, including a machine gun and a shotgun that Taylor said she had helped to modify by sawing off the barrel. Upon hearing Taylor's charges, Deputy Cundiff contacted Harris, a special agent with the Bureau of Alcohol, Tobacco, and Firearms (ATF), and related this information. Agent Harris, relying on information given to him by Deputy Cundiff, obtained a federal search warrant. The warrant authorized Harris or "another authorized officer" to search Buonocore's house for "firearms not registered to him in the National Firearms Registration and Transfer Records."
 
 
 8
 Deputy Cundiff also contacted James Thompson, a C & P security officer, who had been referred to Cundiff by Taylor, and invited Thompson to accompany the officers on the search. Cundiff testified that he had previously advised Commonwealth Attorney Cliff Hapgood of the allegations that Taylor had made about C & P property, and asked Hapgood "[i]f Mr. Thompson could go along on the search to identify the property." According to Cundiff, Hapgood had said that Thompson "could go along on the search to identify the property ... as long as he did not initiate the original search or search for the guns." Hapgood himself never testified at trial.
 
 
 9
 On the evening of November 24, Harris, with other ATF agents, drove to the Franklin County sheriff's office, where they met with Deputy Cundiff and other sheriff's deputies who would assist in the search. There, Agent Harris met James Thompson for the first time. Harris asked Deputy Cundiff if it was proper to take Thompson on the search. Agent Harris testified that he had reservations about the propriety of Thompson accompanying the officers on the search, and that in more than twenty years as an ATF agent, Harris had never permitted a private citizen to accompany him on a search. But, according to Agent Harris, Deputy Cundiff assured him that Cundiff had checked with Hapgood who said "it was proper procedure for him to be--for Mr. Thompson to be able to go with us to identify property that was possibly stolen from his employer." Cundiff confirmed that he had told Harris, "I had talked to Cliff [Hapgood] and ... he said it was okay if Mr. Thompson went with us on the search, as long as he did not initiate the search, to identify property, if we found any, belonging to C & P Telephone." Based on this assurance, Harris agreed to Thompson's presence on the search.
 
 
 10
 At 8:45 p.m., Agent Harris, accompanied by Deputy Cundiff, several other ATF agents and deputy sheriffs, and Thompson, arrived at Buonocore's home. While Thompson waited in Cundiff's car, the officers loudly pounded on Buonocore's front door with their guns drawn. When Buonocore appeared, the officers told him to put his hands up and not to move. After patting him down to make sure he had no weapons, the officers entered the house. Buonocore was escorted to his basement. When the officers had searched the house and determined that there was no one else in it, they told Buonocore that they were looking for illegal firearms and asked him if he had any guns. Buonocore told them that there was a closed cupboard over the back door with several rifles in it, a gun underneath his bed, and other guns in a gun safe in the basement. The agents requested that he open the gun safe, which he did. From it he took out guns and two sheets that listed each gun that he owned with its serial number and date of purchase. Upon inspection of these sheets and all of Buonocore's firearms, the law enforcement officers discovered that none of the weapons were illegal or unregistered. The weapon that Taylor had identified as a "machine gun" was actually a semi-automatic rifle and the barrel of the shotgun that she had helped saw off was within the legal limit.
 
 
 11
 After the agents had examined Buonocore's weapons, and the search had progressed for "ten or fifteen minutes" by Thompson's reckoning, Cundiff returned to his car and asked Thompson, who had been waiting there, to come into the house. During the 10 to 15 minutes that Thompson waited in Cundiff's car, Thompson acknowledged that he was outside alone within fifty feet of Buonocore's truck. During the night of the search Thompson compiled an inventory of items belonging to C & P, some of which he testified he saw in a tool box in the back of that truck.
 
 
 12
 Cundiff testified that he asked Thompson to enter into Buonocore's house because he wanted Thompson to identify items that Cundiff had seen in plain view during the search for weapons and believed might be C & P property. Cundiff explained that he "didn't know whether [those items were] stolen from the company.... So [he] wanted to get [them] identified."
 
 
 13
 Sometime after Thompson entered Buonocore's house, Buonocore went into his basement workshop to get some cigarettes. There, he saw a man standing next to his file cabinet. Buonocore explained that none of the drawers of the cabinet had been open at the beginning of the search but that now "[t]he bottom drawer was open, and [the man] was rummaging through it." He further testified that he particularly noticed the man who was rummaging through his files because the man "had a white sweater on, where everybody else had blue jackets." Buonocore left the workshop area for a short time and then returned for another cigarette. At that time, he saw the man in the white sweater standing in front of his work bench with a piece of paper on which the man was writing something. Buonocore went up to him and asked him who he was. The man ignored him. Buonocore asked him again who he was, and the man identified himself as James Thompson of C & P security. Buonocore told Thompson that "he had no right to be in [Buonocore's] house." At that time, Deputy Cundiff, who had been talking to someone else, turned around and then came over to the area and, according to Buonocore, Cundiff informed him that Thompson had a right to be in Buonocore's house "because a crime had been committed." Cundiff confirmed that he told Buonocore that Thompson "was with [him]. He's going to identify property."
 
 
 14
 At trial, Thompson acknowledged that for twenty to twenty-five minutes he had conducted a search for C & P property in Buonocore's house at Cundiff's invitation. Thompson explained that by search he meant that "I went in at the request of Mr. Cundiff and looked for property that appeared to be in plain view that would belong to Bell Atlantic or, at the time, C & P Telephone." Thompson also testified that Buonocore had told him he had no right to be in Buonocore's house and Cundiff had responded that Thompson did have "every right to be there." Thompson denied opening anything or expanding his role beyond identification of C & P property; however, no state or federal officer, or anyone else, acknowledged opening the file cabinet, which had been closed before the search. Thompson conceded that, prior to entering Buonocore's house, he had been shown a photograph taken by Taylor, in which C & P items were located in this file cabinet. Thompson was not specifically asked if he "rummaged" through the file cabinet.
 
 
 15
 No evidence was offered that Agent Harris supervised or worked with Thompson. Buonocore testified that Harris treated him "fairly," and acted in a "businesslike and professional manner" during the search and that his only complaint as to Harris' conduct was that Harris "had knowledge of a private citizen coming along without a search warrant for what they were looking for, telephone property." Harris testified that he did not notice Thompson much, except that Thompson was present, and that he did not see Thompson going through boxes or drawers; but Harris also acknowledged that he spent no time helping Thompson look for property belonging to C & P.
 
 
 16
 Cundiff confirmed that he had contacted Thompson, invited him to accompany the officers on the search to identify C & P property, driven him to Buonocore's house, left him alone outside the house for ten to fifteen minutes, and ultimately asked him to enter the house. Cundiff also testified that he showed Thompson items that Cundiff believed to be C & P property, and that when Buonocore said Thompson did not have a right to be in the house, he told Buonocore that Thompson did have a right to be there, explaining, "He's with me. He's going to identify property." Cundiff denied seeing Thompson open any drawers or rummage through any file cabinet.
 
 
 17
 ATF Agent Scott Fairburn testified that after the officers had completed their search of Buonocore's home, he asked Buonocore if they could search his truck. With Buonocore's consent, Fairburn and some deputies searched the truck and the tool box in the truck; they found no weapons. C & P employee Thompson denied taking part in this search of the truck or witnessing it, but instead testified that at an unspecified time when he was "walking by the truck ... the lids on the truck was opened [sic]," (and apparently the tool box lid as well) and he saw and inventoried C & P items in the tool box. Cundiff testified that he was with Thompson "the whole time" during the search; however, he stated that he did not take part in any search of Buonocore's truck and did not observe Thompson inventorying C & P property inside the tool box in the truck.
 
 
 18
 No weapons were seized from Buonocore's residence or truck on November 24, 1992. Nor was Buonocore charged with any offense as a result of the search. Thompson's inventory listed a number of relatively inexpensive items belonging to C & P found in Buonocore's home and truck. These items included rolls of tape, glass cleaner, twine, insect repellent spray, an installer's headset, protective gloves, splicing scissors, a bush axe, and utility tapes. Cundiff asked Thompson if he wanted him to obtain a warrant for these goods. Thompson declined, saying C & P would handle the matter "administratively."
 
 
 19
 Although Buonocore maintained that C & P managers had either thrown away or authorized him to take and modify or repair most of the C & P property found in his home, and a long-time C & P employee confirmed that many C & P employees took home similar items, Buonocore was dismissed from his job at C & P on December 3, 1992 for failing to secure "specific authorization" to have C & P property in his possession. He testified that he could not sleep in his house for several nights after the search, remained fearful for some months, and had a difficult time obtaining new employment.
 
 
 20
 At the close of evidence, both Buonocore and the officers moved pursuant to Rule 50 of the Federal Rules of Civil Procedure for judgment as a matter of law. The district court, Judge Jackson L. Kiser, rejected those motions reasoning:
 
 
 21
 [I]t seems to me there is a triable issue of fact as to a very narrow question, and that is--well, maybe two questions; that is, first of all, whether the defendants brought or invited Mr. Thompson along to participate in the search. If they did, it was an illegal search. But if his sole function was to be there, quote, "as a technical advisor," under 3105, then as I read the statute this is permissible.
 
 
 22
 The second issue would be whether the officers permitted Mr. Thompson to exceed the scope of his invitation and actually participate in the search. If he did, then I think that is a constitutional violation.
 
 
 23
 But I think both issues are squarely disputed facts, are disputed facts squarely before the jury. Consequently, I'll overrule all motions.
 
 II.
 
 24
 Buonocore makes two contentions on appeal. First, he asserts the district court erred in instructing the jury as to the plain view doctrine. Second, he maintains that he was entitled to judgment as a matter of law against Harris. Neither argument is compelling.
 
 A.
 
 25
 At trial, the officers maintained that C & P employee Thompson did not conduct an independent search. They contended that, under Cundiff's supervision, Thompson simply assisted in identifying possible items stolen from C & P that the officers had seen in plain view during their search for firearms. Buonocore disputed this contention. He maintained that Thompson, attempting to recover C & P property, engaged in an independent search of Buonocore's possessions--rummaging through his filing cabinet and inventorying the contents of his truck.
 
 The district court instructed the jury:
 
 26
 Now the search warrant in this case authorized the officers to search for unregistered firearms. The warrant did not authorize them to search for stolen property. There is an exception to this, however, known as the plain view doctrine. Simply stated, the plain view doctrine permits officers to observe any item that is discovered in the course of a lawful search.
 
 
 27
 You will note that I stated that the warrant authorized law officers to conduct the search. This means that only law officers can conduct a search. But again, there is an exception to this restriction. The exception permits law officers to use technical advisers to accompany the officer during the course of the search.
 
 
 28
 Thus, applying these two exceptions to this case, if the officers were searching only for firearms and the only role of Mr. Thompson was to identify possible stolen property which was discovered during the search for guns, the search was a lawful one.
 
 
 29
 If, on the other hand, the officers were also searching for stolen property, as well as guns, or if Thompson was accompanying the officers to participate in a search for stolen property or did in fact conduct a search himself, then the search was illegal.
 
 
 30
 Buonocore asserts that this instruction constitutes reversible error because it includes a misstatement of the plain view doctrine. Considering the instruction in its entirety, as we must, we believe it provides no basis for reversal.
 
 
 31
 The district court did not tell the jurors that the plain view doctrine permitted the officers, who were authorized by warrant to search only for firearms, to engage in a general search. Nor did the court tell them that the plain view doctrine permitted a private citizen, here Thompson, to engage in an independent search for items in plain view, for example, the C & P property. Instead, the court instructed the jurors that the plain view doctrine allowed "the officers to observe any item that is discovered in the course of a lawful search," but that if the officers were "searching for stolen property, as well as guns, or if Thompson ... did in fact conduct a search himself, the search was illegal." This description of legal and illegal search activity was correct. See generally Buonocore, 65 F.3d at 356-59.
 
 
 32
 To be sure, the court's use of the term "plain view doctrine" was not entirely accurate. Actually, because the plain view doctrine provides an exception to the warrant requirement for seizures, not searches, it "has no applicability" where nothing is seized. Id. at 357 n. 8. However, this does not mean, as Buonocore seems to believe, that police officers, while lawfully searching, are not permitted to observe items in plain view. Rather, "[v]iewing an article that is already in plain view does not involve an invasion of privacy and, consequently, does not constitute a search implicating the Fourth Amendment." United States v. Jackson, 131 F.3d 1105, 1108 (4th Cir.1997). Thus, law enforcement officers engaging in a lawful search can, without even "implicating the Fourth Amendment," view any items already in plain view and the plain view doctrine permits seizure of incriminating items in plain view. Although the district court did not explain the plain view doctrine with technical precision, the court's essential instruction was correct. The court slightly confused why certain activity was legal but it accurately explained what was legal. Accordingly, the instruction provides no basis for reversal.
 
 B.
 
 33
 Nor did the evidence produced at trial entitle Buonocore to judgment as a matter of law against Harris.
 
 
 34
 Consistent with the Supreme Court's teachings in Bivens v. Six Unknown Named Agents of Fed. Bureau of Narcotics, 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971), the district court instructed the jury that for Buonocore to prevail he had to prove:
 
 
 35
 one, the officers, either intentionally or recklessly, invited Mr. Thompson to participate in the search in a capacity other than as an adviser; or two, the officers, either intentionally or recklessly, permitted Mr. Thompson to exceed the scope of his function as an adviser and search for C & P property himself.
 
 
 36
 Buonocore does not object to this instruction. As we have indicated above, the evidence Buonocore produced as to the culpability of Harris and Cundiff radically differed. It seems clear, as the officers point out, that although the jury "ineluctably found that ... an illegal search occurred" it "did not hold [Harris] responsible" for the search but "did hold Cundiff responsible." Brief of Appellees at 28. Certainly a reasonable jury could have so concluded. There is no basis for upsetting the verdict.
 
 III.
 
 37
 Cundiff's argument on cross appeal--that he was entitled to qualified immunity--is no more convincing. We have already rejected Cundiff's initial contention that controlling legal principles were not clearly established at the time the search took place. We have expressly held that by the time of the November 1992 search, it was clearly established that "the Fourth Amendment prohibits government agents from allowing a search warrant to be used to facilitate a private individual's independent search of another's home for items unrelated to those specified in the warrant." Buonocore, 65 F.3d at 356.
 
 
 38
 Moreover, contrary to Cundiff's assertions, Buonocore offered evidence at trial from which a reasonable jury could have concluded that Cundiff did precisely this; that is, he allowed a search warrant to be used to facilitate a private individual (Thompson) in conducting an independent search of the home of another (Buonocore) for items (C & P property) unrelated to those specified in the warrant (illegal guns). A jury could have found that Cundiff, after inviting Thompson to join the search, did not properly supervise him. Rather, Cundiff permitted Thompson--on his own--to open and rummage through Buonocore's file cabinet and possibly to search Buonocore's truck.[1]
 
 
 39
 Cundiff simply refuses to acknowledge this evidence and instead argues that "most of [the material] issues of fact were undisputed by Buonocore at trial and were resolved in favor of Harris and Cundiff." Brief of Appellees at 10. This contention is at odds with Cundiff's own argument, in defending against Buonocore's appeal and urging that the evidence was sufficient to support the verdict in Harris' favor, that "[t]he question[s] of exactly when Thompson came into Buonocore's home, and exactly what he did while he was there, were disputed at trial." Id. at 17. Moreover, as outlined above, the parties also contested other critical facts at trial: whether Thompson opened or rummaged in a file drawer, whether Thompson inventoried the contents of Buonocore's truck on his own or simply identified items after the officers had searched for guns, and whether Harris and Cundiff acted reasonably in supervising Thompson during the search. Thus, the parties offered conflicting evidence as to the critical question of whether the officers permitted Thompson to conduct an unauthorized independent search of Buonocore's belongings. On cross-appeal, Cundiff attempts to ignore conflicting evidence on these matters and rely on inapposite cases in which it was either not alleged or not proved that third persons engaged in any independent search.
 
 
 40
 Because Buonocore presented evidence from which a jury need not,[2] but could have, concluded that Cundiff made it possible for a private citizen (Thompson) to engage in his own independent search of the home and private property of another private citizen, Cundiff's argument must fail. No case holds that the Fourth Amendment permits such a search, or that an officer who facilitates such a search is entitled to qualified immunity. Rather, as we documented in the earlier appeal in this case, "the special protection to be afforded a person's right to privacy within his own home" has long been " 'afforded the most stringent Fourth Amendment protection.' " Buonocore, 65 F.3d at 356 (quoting Martinez-Fuerte, 428 U.S. at 561, 96 S.Ct. at 3084).
 
 
 41
 Nor does the fact that Cundiff assertedly relied upon legal advice strengthen his claim to qualified immunity. In Harlow v. Fitzgerald, 457 U.S. 800, 818-19, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982), the Supreme Court held that when, as here, the law is clearly established, the qualified immunity defense "ordinarily should fail, since a reasonably competent public official should know the law governing his conduct." But the Court added one possible exception to this general rule, on which Cundiff relies for his final argument. The Harlow Court noted that "if the official pleading the [qualified immunity] defense claims extraordinary circumstances and can prove that he neither knew nor should have known of the relevant legal standard, the defense should be sustained." Id. (emphasis added). Thus, the defendant officer bears the burden of proving the existence of extraordinary circumstances. See also Cannon v. City and County of Denver, 998 F.2d 867, 874 (10th Cir.1993).
 
 
 42
 Cundiff argues that because he sought advice from Commonwealth Attorney Hapgood he can obtain the benefit of this exception to the Harlow rule. His argument fails for two reasons.
 
 
 43
 First, other than the fact that he sought legal advice, Cundiff offers no proof, or even any assertion, that his situation was "extraordinary." It is hardly unusual, let alone extraordinary, for public officers to seek legal advice. See V-I Oil Co. v. State of Wyo. Dep't of Envtl. Quality, 902 F.2d 1482, 1488 (10th Cir.) ("few things in government are more common than the receipt of legal advice"), cert. denied, 498 U.S. 920, 111 S.Ct. 295, 112 L.Ed.2d 249 (1990). Accordingly, although reliance on counsel's advice may indeed be a factor to be considered in deciding whether a defendant has demonstrated an "extraordinary circumstance," reliance on legal advice alone does not, in and of itself, constitute an "extraordinary circumstance" sufficient to prove entitlement to the exception to the general Harlow rule. Hollingsworth v. Hill, 110 F.3d 733, 741 (10th Cir.1997) ("reliance upon counsel is not itself an extraordinary circumstance"); see also V-I Oil, 902 F.2d at 1489; Gordon v. Kidd, 971 F.2d 1087, 1097 (4th Cir.1992) (to invoke the exception set forth in Harlow, a public officer must demonstrate ordinary circumstances "coupled with a lack of knowledge about the law") (emphasis added); Watertown Equip. Co. v. Norwest Bank Watertown, N.A., 830 F.2d 1487, 1495 (8th Cir.1987) (although a factor to be considered, "reliance on the advice of counsel alone will not satisfy an official's burden"), cert. denied, Green v. Watertown Equip. Co., 486 U.S. 1001, 108 S.Ct. 1723, 100 L.Ed.2d 188 (1988) (emphasis added).
 
 
 44
 Secondly, and more fundamentally, Cundiff's claim fails because Cundiff did not follow Hapgood's advice. A public official who fails to follow legal advice obviously cannot rely on that advice to establish entitlement to qualified immunity.
 
 
 45
 Cundiff testified that he asked Hapgood if Thompson could accompany Cundiff "on the search to identify the [C & P] property," that Hapgood responded that Thompson "could go along on the search to identify the property," and that Hapgood cautioned that Thompson could not "initiate" a search or "search for guns." (Emphasis added.) Agent Harris similarly testified that Cundiff told him that Hapgood had said "it was proper procedure" for Thompson to go along on the search "to identify property that was possibly stolen from his employer." (Emphasis added.) Finally, Cundiff confirmed that he told Harris, "I talked with Cliff [Hapgood] and he said it was okay if Mr. Thompson went with us on the search ... to identify property ... as long as he did not initiate the search." (Emphasis added.) Thus, Hapgood never advised Cundiff that it was proper for Thompson to do anything other than identify C & P property. Indeed, by Cundiff's own account, Hapgood specifically warned him that Thompson could not "initiate" a search or participate in any search for guns. Not even in his appellate briefs does Cundiff claim he received legal advice from Hapgood that it was permissible for Thompson to do anything other than identify C & P property that Cundiff had already seen.
 
 
 46
 Buonocore, however, presented evidence that rather than limiting Thompson to identifying C & P property, Cundiff permitted Thompson to do precisely what Hapgood warned against--conduct his own independent search for C & P property, opening and rummaging through Buonocore's file cabinet and possibly searching Buonocore's truck. Judge Kiser properly instructed the jury that only if it credited this evidence could it find for Buonocore. But if this evidence was credited, as apparently it was, it proved not only that Cundiff violated the Fourth Amendment but also that he failed to follow Hapgood's legal advice. Cundiff cannot obtain any immunity because of reliance on legal advice that he failed to follow.[3]
 
 IV.
 
 47
 For these reasons, the judgment of the district court is in all respects
 
 
 48
 AFFIRMED.
 
 WILLIAMS, Circuit Judge, concurring:
 
 49
 I agree with the Majority that the judgment of the district court should be affirmed in all respects. I write separately, however, to underscore the limited holding of Part III. In Part III, we hold that a state actor who fails to follow legal advice cannot rely upon that advice to establish qualified immunity. Because Deputy Cundiff failed to follow the legal advice that he was given, he is simply not entitled to qualified immunity. In light of our actual holding, the discussion concerning the legal significance of actually following the advice of counsel is unnecessary and can best be described as dicta. See Bettius & Sanderson, P.C. v. Nat'l Union Fire Ins. Co., 839 F.2d 1009, 1019 n. 3 (4th Cir.1988) (Murnaghan, J., concurring in part and dissenting in part) (stating that "[t]o reach out and decide what need not be decided is frequently denigrated as dictum ").
 
 
 50
 If the issue were squarely before us, I would not adopt a rule that discouraged a state actor from seeking and following legal advice. See McElveen v. County of Prince William, 725 F.2d 954, 958 n. 5 (4th Cir.1984) (noting that, in some cases, one who relies upon legal advice may be entitled to qualified immunity); Tanner v. Hardy, 764 F.2d 1024, 1027 (4th Cir.1985) (noting that reliance upon advice from counsel is a factor to be considered in determining whether qualified immunity applies); see also Hollingsworth v. Hill, 110 F.3d 733, 741 (10th Cir.1997) (stating that reliance upon counsel "is a vital ingredient in cases where we have found extraordinary circumstances to exist"); V-1 Oil Co. v. State of Wyoming, 902 F.2d 1482, 1488 (10th Cir.1990) (stating that "reliance on the advice of counsel in certain circumstances rises to the level of extraordinary circumstances" (internal quotation marks omitted)); Watertown Equip. Co. v. Norwest Bank Watertown, N.A., 830 F.2d 1487, 1495 (8th Cir.1987) ("[R]eliance on the advice of counsel ... may be a factor which bears on the question of qualified immunity.").
 
 
 
 [1]
 Although Buonocore offered direct evidence that Deputy Cundiff permitted Thompson to rummage in the file cabinet, he introduced no direct evidence that Cundiff permitted Thompson to open the cabinet or search the truck. However, Buonocore did present uncontroverted evidence that the file cabinet was opened during the search, that Thompson was near it and rummaging through it, and that no one else acknowledged opening it. Similarly, he presented uncontroverted evidence that Thompson inventoried the contents of the truck, that Cundiff left him outside, alone and unsupervised, for at least ten minutes near the truck, and that except for this period, Cundiff testified he was with Thompson the "whole time" yet he never saw Thompson inventory the contents of the truck. It is well established that such "circumstantial evidence is no less probative than direct evidence." Stamper v. Muncie, 944 F.2d 170, 174 (4th Cir.1991)
 
 
 [2]
 Of course, Cundiff testified that Thompson did not conduct an independent search for anything, but simply identified items, which Cundiff had already seen, as C & P property. The district court properly instructed the jury that if this was all that Thompson did then the "search was a lawful one" and Buonocore could not recover
 
 
 [3]
 No case holds that legal advice, which a defendant fails to follow, can constitute the basis for the extraordinary circumstances exception to the Harlow rule. Nor is any such holding possible. Proof that one followed legal advice must be a prerequisite to any claim of immunity based on that advice. Of course, as explained within, simply following legal advice is insufficient to establish the extraordinary circumstances exception. Thus, the two cases upon which Cundiff relies set forth an elaborate multi-factor test to be examined to discern whether a defendant's reliance on legal advice is coupled with extraordinary circumstances, see Cannon, 998 F.2d at 874; V-I Oil, 902 F.2d at 1488, and in one of these cases the court concluded that even though the defendant indisputably followed legal advice, he had not established extraordinary circumstances. See Cannon, 998 F.2d at 874-75