RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206
File Name: 11a0252p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT
_____

RODNEY COCHRAN,

　　　　　*Plaintiff-Appellee,*

　　　v.

No. 10-6274

DAN GILLIAM and DON GILLIAM,
individually,

　　　　　*Defendants-Appellants.*

_____

Appeal from the United States District Court
for the Eastern District of Kentucky at Lexington.
No. 09-00302—Joseph M. Hood, District Judge.

Argued: April 29, 2011

Decided and Filed: September 2, 2011

Before: McKEAGUE and WHITE, Circuit Judges; ZOUHARY, District Judge.[*]

_____

**COUNSEL**

**ARGUED:** Winter R. Huff, LAW OFFICES OF JOHN G. PRATHER, Somerset, Kentucky, for Appellants. Cameron Cole Griffith, THEODORE H. LAVIT & ASSOCIATES, P.S.C., Lebanon, Kentucky, for Appellee. **ON BRIEF:** Winter R. Huff, LAW OFFICES OF JOHN G. PRATHER, Somerset, Kentucky, for Appellants. Theodore H. Lavit, THEODORE H. LAVIT & ASSOCIATES, P.S.C., Lebanon, Kentucky, for Appellee.

_____

**OPINION**

_____

　　ZOUHARY, District Judge. In this 42 U.S.C. § 1983 action, Defendants-Appellants Dan and Don Gilliam (collectively, "Gilliams") appeal the district court's

_____

[*] The Honorable Jack Zouhary, United States District Judge for the Northern District of Ohio, sitting by designation.

denial of their motion for summary judgment on the basis of qualified immunity. Plaintiff-Appellee Rodney Cochran alleges the Gilliams, both deputy sheriffs in Lincoln County, Kentucky, violated his constitutional rights by assisting Cochran's landlords in wrongfully seizing all his personal property without due process during the execution of an eviction order.  For the reasons set forth below, we **AFFIRM** the district court's decision denying summary judgment.

**BACKGROUND**

**Cochran's Eviction**

In 2008, Rodney Cochran leased a home from Charles and Laila Williams ("Landlords") in Stanford, Kentucky.  Cochran fell behind on his rent and, as of August 2008, Cochran owed the Landlords $1,225 for a portion of the July rent, rent for the entire month of August, and late fees. *Cochran v. Folger*, 740 F. Supp. 2d 923, 927 (E.D. Ky. 2010).

The Landlords filed a Forcible Detainer Complaint in state court on August 18, 2008.  While it is not clear whether Cochran received the Complaint or was aware of the scheduled hearing, the state district court ruled against Cochran and issued a Judgment in Forcible Detainer, stating Cochran "was guilty of forcible detainer as charged and that [the Landlords] have [*sic*] restitution of the premises . . . and recover of the Defendant the costs expended herein." *Id.* at 927–28.  In connection with this Judgment, the court issued a standard form "Eviction Notice: Warrant for Possession" on September 5, 2008. The Notice read:

> To the Sheriff or any other Constable of Lincoln County: Defendant [Cochran] on 8-28-2008 was found guilty of a forcible detainer of the premises located at 3700 HWY 2141, Stanford, KY 40484 to the injury of the Plaintiff [Mr. and Mrs. Williams].  Defendant having failed to file an appeal on or before the seventh day after the finding, and upon request of the Plaintiff, you are commanded, in the name of the Commonwealth of Kentucky, to put the Plaintiff in possession of the premises, and to make due return to the Court within 8 days showing you have executed this warrant.

This Eviction Notice was executed on Cochran's residence three days later by the Landlords, the Gilliams, and another deputy sheriff who is not a party to this lawsuit. *Id.* at 928. Cochran does not challenge the validity of the Judgment or the Eviction Notice.

**Execution of the Eviction Notice**

The events that occurred on September 8, during the execution of the Eviction Notice, form the basis of this lawsuit. The following paragraphs, excerpted from the district court opinion, recite the pertinent facts:

> [The] Williams and Deputy Sheriffs Don Gilliam, Bill Schnitzler and Dan Gilliam arrived at Cochran's home at some point during the day to execute the Warrant for Possession. It is undisputed that the Warrant for Possession, and the Judgment in Forcible Detainer on which it was based, were the only authority for the Williamses and the deputy sheriffs' actions that day. It is further undisputed that the deputy sheriffs only reviewed and relied upon the Warrant for Possession for their actions.

> According to Don Gilliam's Affidavit, after reviewing the Warrant for Possession, he realized that it was silent as to Cochran's personal property located at the premises. Don Gilliam told Mr. Williams to secure Cochran's personal property as he expected that Cochran would want to take it following the eviction.

> Mr. Williams advised Don Gilliam that the Lincoln County Attorney had told him that Cochran's personal property could be sold to recover Mr. and Mrs. Williams' losses. Don Gilliam states that he then contacted the county attorney and was told that Mr. Williams had a "right to sell the property". Using a key to enter the residence, Mr. and Mrs. Williams, with the assistance of others, removed Cochran's personal property from the residence.

> Cochran was at work when he received a message from his neighbor, Dr. Shane Randolph, indicating that the Williams and the deputy sheriffs were at Cochran's home. Cochran's mother and sister were already on site by the time he arrived.

> The deputy sheriffs on site threatened to restrain and/or arrest anyone who attempted to interfere with the Williams' procurement of Cochran's personal property. Cochran, his neighbors, and family made calls to 911 and the Kentucky State Police throughout the day to try to stop the Williams from taking Cochran's personal belongings. Dr.

Randolph attempted to call the Sheriff, Curt Folger, but was informed that he was out of town on September 8, 2008 and could not be reached.

Don and Dan Gilliam were both present on the premises during the removal of Cochran's personal property. Don Gilliam admits that he paid $100 to the Williams for a television that was removed from Cochran's home. He states that he purchased the television for use at the Sheriff's office. Cochran's guns and prescription medications were also taken by the deputy sheriffs. At the Williams' request, the guns were turned over to Mr. Williams' uncle, Constable John Williams the next day.

Cochran asked the Williams for the return of his personal property and offered money in exchange for the return of his property. Those requests were denied. To date, none of Cochran's personal belongings have been returned to him.

*Cochran*, 740 F. Supp. 2d at 928–29 (internal footnote omitted). Shortly after the eviction, the Landlords declared bankruptcy, further thwarting Cochran's recovery efforts.

**Disputed Details**

While not disputing the accuracy of the district court's statement of facts, the parties disagree about several additional details of the events on September 8.

First, the Gilliams dispute the district court's statement that Don Gilliam only reviewed and relied upon the Warrant for Possession in support of his actions that day. While it is true that the Warrant was the only *document* relied upon by Don Gilliam, he spoke with the county attorney by phone to inquire whether the Landlords could indeed sell Cochran's property to recover the rent owed. The Gilliams claim the district court did not consider this additional supporting basis for the Gilliams' actions. The Gilliams' claim is incorrect; the district court explicitly considered Don Gilliam's conversation with the county attorney, comparing his conversation to the scenario in *Soldal v. Cook County, Ill.*, 506 U.S. 56–58 (1992). *Cochran*, 740 F. Supp. 2d at 931 n.3.

Second, the parties disagree about the calls made to the Kentucky State Police. The Gilliams claim Cochran called the state police but then sent the responding officers away once they arrived. In contrast, Cochran points to the call report, obtained from the

state police, indicating a deputy sheriff advised the responding state police that "they will handle it." While the call report does not explicitly name the sheriff's officer, the record supports that it was a deputy sheriff, not Cochran, who turned away the state police.

Third, the parties disagree over the Gilliams' actual involvement in the alleged seizure of Cochran's personal property. While the Gilliams attempt to portray their presence that day as limited to their official duties of serving the Warrant for Possession and keeping the peace, this generic portrayal is not supported by the record. The Gilliams admit to helping the Landlords load Cochran's property onto the Landlords' vehicles, stating: "[T]he deputies did assist Mr. and Mrs. Williams . . . in loading property." Furthermore, the record contains photos that show the Gilliams, dressed in their uniforms, removing Cochran's property from the house and loading it onto a blue pickup truck. Taken together and viewing these facts in the light most favorable to Cochran, as we must at this juncture, these facts show the Gilliams' actions that day were not limited to simply serving the Warrant and keeping the peace.

**Procedural Background**

Cochran filed this lawsuit pursuant to 42 U.S.C. § 1983 and the Fourth, Fifth, and Fourteenth Amendments, alleging violations of his constitutional rights by the Gilliams. Cochran contends the Gilliams were acting under the color of Kentucky law in their role as deputy sheriffs when they executed the eviction notice, and that the Gilliams carried out the eviction in an "objectively unreasonable" manner that permitted Cochran's personal property to be taken away by the Landlords and unknown parties. Specifically, Cochran argues the Gilliams violated his Fourth Amendment right to be free from unreasonable seizures, and his Fourteenth Amendment due process rights, when the Gilliams, acting in their role as deputy sheriffs, assisted the Landlords in removing and transporting away all his personal property from the house. While Cochran acknowledges the Landlords had the right to remove his property and place it outside on the sidewalk, Cochran claims there was no legal basis for the Gilliams to assist in dispossessing him of his property.

The district court disposed of all claims, except for the Fourth Amendment seizure and Fourteenth Amendment due process claims against the Gilliams in their individual capacities, and a claim for punitive damages. The Gilliams appeal only the district court's denial of qualified immunity on the Fourth and Fourteenth Amendment claims, arguing that Cochran failed to show a violation of constitutional rights or alternatively that any violation of Cochran's rights was not "clearly established" as a matter of law.

## ANALYSIS

### Standard of Review

A denial of summary judgment on the issue of qualified immunity is immediately appealable. *Mitchell v. Forsyth*, 472 U.S. 511, 530 (1985); *Kennedy v. City of Villa Hills, Ky.*, 635 F.3d 210, 213 (6th Cir. 2011). "We review the denial of summary judgment on grounds of qualified immunity *de novo* because application of this doctrine is a question of law." *McCloud v. Testa*, 97 F.3d 1536, 1541 (6th Cir. 1996) (citation omitted). However, "[a] defendant who is denied qualified immunity may file an interlocutory appeal with this Court only if that appeal involves the abstract or pure legal issue of whether the facts alleged by the plaintiff constitute a violation of clearly established law." *Berryman v. Rieger*, 150 F.3d 561, 563 (6th Cir. 1998) (citation omitted).

Because the subject of the interlocutory appeal is limited to the pure legal issue of whether the facts alleged constitute a violation of clearly established law, "a defendant seeking qualified immunity must be willing to concede to the facts as alleged by the plaintiff and discuss only the legal issues raised by the case." *Shehee v. Luttrell*, 199 F.3d 295, 299 (6th Cir. 1999) (citation omitted). In considering the legal issue of qualified immunity, this Court's ability to consider "the facts as alleged by the plaintiff" encompasses "the facts in the entire record, interpreted in the light most favorable to the plaintiff." *Bomar v. City of Pontiac*, 643 F.3d 458, 462 (6th Cir. 2011) (citation omitted). "Only if the undisputed facts or the evidence viewed in the light most favorable to the plaintiff fail to establish a *prima facie* violation of clear constitutional

law may we decide that the defendant is entitled to qualified immunity on an interlocutory appeal." *Berryman*, 150 F.3d at 563 (citations omitted).

**Qualified Immunity**

The affirmative defense of qualified immunity shields "government officials performing discretionary functions . . . from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982); *McKinley v. City of Mansfield*, 404 F.3d 418, 429 (6th Cir. 2005). An official may, however, be held personally liable for civil damages for unlawful official action if that action was not objectively reasonable in light of the legal rules that were "clearly established" at the time it was taken. *Anderson v. Creighton*, 483 U.S. 635, 639 (1987). This "objective legal reasonableness" standard analyzes claims of immunity on a fact-specific, case-by-case basis to determine whether a reasonable official in the defendant's position could have believed that his conduct was lawful, judged from the perspective of the reasonable official on the scene. *See Anderson*, 483 U.S. at 640–41.

To that end, the court makes two inquiries when resolving qualified immunity claims: (1) whether the facts, viewed in the light most favorable to the plaintiff, show a violation of a constitutional right, and (2) whether the right at issue was "clearly established" at the time of the defendant's alleged misconduct. *Saucier v. Katz*, 533 U.S. 194, 201 (2001), *overruled on other grounds by Pearson v. Callahan*, 555 U.S. 223 (2009). The court can consider these two prongs in either order. *Pearson*, 555 U.S. at 236.

When determining whether a right is "clearly established," "[t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Anderson*, 483 U.S. at 640. Further, "an action's unlawfulness can be apparent from direct holdings, from specific examples described as prohibited, or from the general reasoning that a court employs." *Feathers v. Aey*, 319 F.3d 843, 848 (6th Cir. 2003) (citing *Hope v. Pelzer*, 536 U.S. 730, 740–41 (2002)).

**Fourth Amendment Seizure**

A constitutional claim brought under 42 U.S.C. § 1983, such as Cochran's Fourth Amendment seizure claim here, "by its terms requires that any alleged constitutional violation be taken under color of state law, either by government actors or private individuals acting as agents of the state." *Garcia v. Dykstra*, 260 F. App'x 887, 895 (6th Cir. 2008). Typically, government officials "may not be called to answer for the actions of private parties," such as the Landlords' act of taking possession of all Cochran's property that underpins the factual scenario of this case. *Id.*

However, while the Gilliams did not cart away all of Cochran's possessions, the record makes clear the Gilliams were not simply innocent bystanders. Instead, the Gilliams actively aided the Landlords in removing Cochran's belongings from the house and into a pickup truck for the Landlords to haul away. Thus, the relevant question becomes at what point have the police "'become so entangled in [a] private self-help remedy that they may be held to answer under [Section] 1983?'" *Id.* (quoting *Meyers v. Redwood City*, 400 F.3d 765, 771 (9th Cir. 2005)). This question framed the district court's analysis denying the qualified immunity claim, and now frames our *de novo* review.

**Violation of a Constitutional Right**

The Gilliams offer two reasons why their actions that day did not constitute a seizure of Cochran's property in violation of the Fourth Amendment: (1) the Gilliams played no active role in the removal of Cochran's property, and (2) Kentucky law did not prohibit or make unlawful the removal of Cochran's property by the Landlords, thus absolving the Gilliams of any wrongdoing. Both arguments are without merit.

Under the Fourth Amendment, "[a] 'seizure' of property occurs when there is some meaningful interference with an individual's possessory interests in that property." *United States v. Jacobsen*, 466 U.S. 109, 113 (1984). There is no argument that Cochran has a constitutional right to the personal property he keeps in his leased residence. *See Soldal*, 506 U.S. at 69; *see also Rakas v. Illinois*, 439 U.S. 128, 143 n.12 (1978) ("One

of the main rights attaching to property is the right to exclude others") (citing W. Blackstone, COMMENTARIES, Book 2, ch. 1). It is also undisputed that the Gilliams did not take all of Cochran's property, but they actively assisted those who did. The question then becomes whether the Gilliams "meaningfully interfered" with Cochran's interest in his property.

What actions can constitute a meaningful interference with property is determined under a reasonableness analysis. *Soldal*, 506 U.S. at 71 ("'[R]easonableness is still the ultimate standard' under the Fourth Amendment") (quoting *Camara v. Mun. Ct. of S.F.*, 387 U.S. 523, 539 (1967)). While the term "reasonableness" standing alone, without context, is of limited value, the Supreme Court's dicta on Fourth Amendment seizures is instructive. "What matters is the intrusion on the people's security from governmental interference. Therefore, the right against unreasonable seizures would be no less transgressed if the seizure of the house was undertaken to collect evidence, verify compliance with a housing regulation, effect an eviction by the police, or on a whim, for no reason at all." *Id.* at 69.

We agree with the district court's conclusion, relying on the Supreme Court's decision in *Soldal*, that "[p]articipation of deputy sheriffs in an improper seizure of personal property for sale constitute[s] a seizure in violation of the Fourth Amendment." *Cochran*, 740 F. Supp. 2d at 931 (citing *Soldal*, 506 U.S. at 56).

The Supreme Court's decision in *Soldal* addressed a situation in which deputy sheriffs not only stood by to keep the peace during the repossession of a trailer home but played an active role in facilitating the wrongful repossession of the trailer. *Soldal*, 506 U.S. at 57–59. In reaching its decision, the Court rejected a narrow reading of the Fourth Amendment by the Seventh Circuit that required not only a "technical" physical seizure of property but also a concurrent violation of the property owner's privacy or liberty interests. *Id.* at 62–63. Instead, the Court reiterated its prior holding in *Jacobsen* that the Fourth Amendment protects property, as well as, and in addition to, privacy, but that a violation of the Fourth Amendment does not require a violation of both the owner's privacy *and* his interest in the personal property. *Id.* at 62–63 (citing *Jacobsen*, 466 U.S.

at 113), 65.  The Court also noted the Fourth Amendment extends both to a house and personal effects.  *Id.* at 63 n.7.  The Court held the deputy sheriffs, by telling Soldal they were there to prevent his interference in the repossession and by refusing to stop a legally questionable repossession by others, constituted a Fourth Amendment seizure, despite the fact the deputies did not "enter[] Soldal's house, rummage[] through his possessions, or . . . interfere[] with his liberty in the course of the eviction."  *Id.* at 62.  Instead, the deputies stood by while others yanked the trailer home from its moorings and towed it away.  *Id.* at 59.

This Court "has held that an officer's mere presence at the scene to keep the peace while parties carry out their private repossession remedies does not render the repossession action that of the state."  *Revis v. Meldrum*, 489 F.3d 273, 290 (6th Cir. 2007) (citing *United States v. Coleman*, 628 F.2d 961, 963–64 (6th Cir. 1980)).  However, in cases where police officers take an active role in a seizure or eviction, they are no longer mere passive observers and courts have held that the officers are not entitled to qualified immunity.  *See Haverstick Enter., Inc. v. Fin. Fed. Credit, Inc.*, 32 F.3d 989, 995 (6th Cir. 1994).  This is particularly true when there is neither a specific court order permitting the officers' conduct nor any exigent circumstance in which the government's interest would outweigh the individual's interest in his property.  *Cf. Flatford v. City of Monroe*, 17 F.3d 162, 169–71 (6th Cir. 1994).

Here, the record contains photos showing at least one of the two Gilliam brothers carrying items out of the house and helping the Landlords load Cochran's property into a pickup truck.  These affirmative acts take the Gilliams beyond the acts of the deputies in *Soldal* who never entered the house or physically moved any of the property.  The Gilliams' actions place them squarely within the Supreme Court's reaffirmation that a physical seizure of the property constitutes a Fourth Amendment violation.

Further, the Gilliams interposed themselves between Cochran and the Landlords to allow the Landlords to take Cochran's property.  The Gilliams allegedly threatened to arrest Cochran if he interfered with the Landlords' actions, and sent away the state police officer that Cochran had called for assistance.  Then, in a scenario similar to that

in *Soldal*, Don Gilliam, aware of the possible questionable nature of the removal of Cochran's belongings, attempted to clarify the situation by calling the county attorney. The Gilliams then even went so far as to buy Cochran's TV from the Landlords. These acts, taken together, indicate the Gilliams' presence that day went beyond the constitutionally permissible detached keeping of the peace function and crossed over into a "meaningful interference" with Cochran's property.

The Gilliams further argue that because they received advice from the county attorney, their actions were reasonable. Like the district court, we reject this argument.

After executing the eviction notice, Don Gilliam realized that the form eviction notice was silent as to Cochran's personal property and also failed to state any amount the Landlords were entitled to recover for past rent or costs. Because there was no mention of Cochran's personal property in the notice, Don Gilliam suggested to the Landlords that they secure all of Cochran's property. The county attorney allegedly advised the Landlords they could sell Cochran's personal property to recover some of the losses from the eviction. Don Gilliam then called the county attorney to verify such advice and was told that the Landlords had a right to sell the property. Based on this legal advice, the Gilliams claim their actions were reasonable and thus cannot constitute a Fourth Amendment violation.

However, a law enforcement officer's phone call to a county or district attorney for general guidance when confronted with a situation where there is no legal basis for the contemplated actions does not automatically convert unreasonable actions into reasonable actions. "This circuit has determined that reliance on counsel's legal advice constitutes a qualified immunity defense only under 'extraordinary circumstances,' and has never found that those circumstances were met." *Silberstein v. City of Dayton*, 440 F.3d 306, 318 (6th Cir. 2006); *see also Buonocore v. Harris*, 134 F.3d 245, 253 (4th Cir. 1998) ("[A]lthough reliance on counsel's advice may indeed be a factor to be considered in deciding whether a defendant has demonstrated an 'extraordinary circumstance,' reliance on legal advice alone does not, in and of itself, constitute an 'extraordinary circumstance' sufficient to prove entitlement to the exception to the general *Harlow* [*v.*

*Fitzgerald*, 457 U.S. 800 (1982),] rule."). Defendants identify no extraordinary circumstance in this case, and we fail to find any.

Nor do we find any merit in the attempt to factually distinguish *Soldal* from this case. The Gilliams argue that the landlord in *Soldal* did not have an eviction notice authorizing the removal of the trailer, while here the Landlords did have a valid eviction notice. However, a valid eviction notice in hand is not the operative fact. Both in *Soldal* and here, a deputy sheriff called a county attorney to ask whether to intervene. The deputy sheriff in *Soldal* was concerned because there was no eviction notice. Here, there was a valid eviction notice but the Gilliams were concerned with the confiscation of Cochran's personal property because the eviction notice made no provision for such a taking. Thus, while the deputies in *Soldal* oversaw an unlawful eviction, here the Gilliams facilitated an unlawful taking of Cochran's belongings. It is not reasonable for the Gilliams to oversee and personally assist the Landlords in taking possession of Cochran's belongings when there was no apparent legal basis for such action.

In addition to their attempt to distinguish *Soldal*, the Gilliams argue that Kentucky state law supports their reasonable belief that the Landlords had a right to take Cochran's property, thereby absolving them of any constitutional wrongdoing. The Gilliams point to a Kentucky state statute that allows a landlord lien on a tenant's personal property to secure payment of rent. Ky. Rev. Stat. ("K.R.S") § 383.070.

However, as the district court correctly noted, this section of the Kentucky code merely gives the landlord a lien on the personal property—the lien does not give a landlord *carte blanche* to take possession of the tenant's property without going through the proper judicial processes. *See* K.R.S. § 383.030. It is unclear to this Court how it could be construed as reasonable that two deputy sheriffs, knowing that the eviction notice was silent as to the amount owed to the landlord and the disposition of the tenant's personal property, could believe that a "swat team" had the right to the tenant's worldly possessions.

**Whether the Right Was "Clearly Established"**

Having established the Gilliams violated Cochran's Fourth Amendment rights, we consider the second prong of the *Saucier* analysis—whether the right at issue was "clearly established" at the time of the Gilliams' conduct. The Gilliams argue that, even if there was a violation of Cochran's Fourth Amendment right based upon an unreasonable seizure of his personal property, there was no "clearly established" decision or precedent on point that would have placed them on notice that their conduct could be construed as a constitutional violation. We disagree.

The Gilliams argue for an overly narrow reading of the "clearly established" standard, one in which it would appear no case would be sufficiently on point if the facts at issue were not identical. The Gilliams' reasoning is untenable in the larger view of qualified immunity determinations. We are not alone in rejecting this narrow reading. As the Supreme Court has stated: "This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful; but it is to say that in the light of pre-existing law the unlawfulness must be apparent." *Anderson*, 483 U.S. at 640 (citations omitted).

Furthermore, this Court has employed a more reasonable, common sense approach to the "clearly established" analysis, one that acknowledges that, while every situation will involve slightly different factual scenarios, they are not so different that courts and public officials cannot intuit the contours of the rights at issue. Under this standard, a right is "clearly established," when "'[t]he contours of the right [are] sufficiently clear that a reasonable official would understand that what he is doing violates that right.'" *Feathers*, 319 F.3d at 848 (quoting *Anderson*, 483 U.S. at 640). Additionally, "an action's unlawfulness can be apparent from direct holdings, from specific examples described as prohibited, or from the general reasoning that a court employs." *Hope*, 536 U.S. at 740–41.

This Court is satisfied that the Fourth Amendment violation was clearly established. The Supreme Court decided *Soldal* in 1992, well before the conduct at issue here, and the standard has long been that when police neither encourage nor direct a

private individual during a repossession, but merely "stand by in case of trouble," there is no liability. *United States v. Coleman*, 628 F.2d 961, 964 (6th Cir. 1980). *See also Haverstick Enter., Inc.*, 32 F.3d 989, 995 (a police officer's mere presence as a "civil standby" to observe and maintain the peace at a lawful statutory repossession entitles a defendant to qualified immunity). However, in cases such as here where officers take an active role in a seizure or eviction, this Circuit has held they may no longer be entitled to qualified immunity. *See Soldal*, 506 U.S. at 69; *Flatford*, 17 F.3d at 170 n.8 (quoting *Soldal* 506 U.S. at 69).

Finally, we note our application of *Soldal* is consistent with other circuits regarding police officers taking active roles in otherwise private self-help remedies. Generally, "officers are not state actors during a private repossession if they act only to keep the peace, but they cross the line if they affirmatively intervene to aid the repossessor." *Marcus v. McCollum*, 394 F.3d 813, 818–19 (10th Cir. 2004) (citing similar cases from the Fifth, Ninth, and Eleventh Circuits). The Second Circuit has discussed police officers' involvement in repossessions as a continuum, stating: "When an officer begins to take a more active hand in the repossession, and as such involvement becomes increasingly critical, a point may be reached at which police assistance at the scene of a private repossession may cause the repossession to take on the character of state action." *Barrett v. Harwood*, 189 F.3d 297, 302 (2d Cir. 1999). *See also Booker v. City of Atlanta*, 776 F.2d 272, 274 (11th Cir. 1985) (police officer's "arrival with the repossessor gave the repossession a cachet of legality and had the effect of intimidating [the plaintiff] into not exercising his right to resist, thus facilitating the repossession. Even if unintended, such an effect could constitute police 'intervention and aid' sufficient to establish state action.").

Accordingly, we reject the Gilliams' argument that their active involvement in assisting the Landlords in seizing Cochran's property was objectively reasonable in light of the legal rules that were "clearly established" at the time. *Anderson*, 483 U.S. at 639. While the Gilliams' involvement may have begun as a civil standby to serve the eviction notice and simply keep the peace, their actions quickly turned into active participation

in the seizure of Cochran's property—conduct explicitly foreclosed by the holding of *Sodal*, and in line with the reasoning from *Coleman* and *Haverstick*.

**Fourteenth Amendment Due Process**

Because we agree with the district court's denial of qualified immunity with respect to Cochran's Fourth Amendment claim, we need not address the qualified immunity argument with respect to the Fourteenth Amendment due process claim. *See Saucier*, 533 U.S. at 200–01 ("Qualified immunity is 'an entitlement not to stand trial or face the other burdens of litigation.' The privilege is 'an *immunity from suit* rather than a mere defense to liability . . . .'") (quoting *Mitchell*, 472 U.S. at 526).

## CONCLUSION

For the foregoing reasons, we **AFFIRM** the district court's denial of the Gilliams' motion for summary judgment on the basis of qualified immunity.