NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 08a0074n.06
Filed: January 24, 2008

Nos. 06-2315

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

|  |  |  |
|---|---|---|
| | ) | |
| STEPHANIE GARCIA, JOEL GARCIA, CHRISTINA SMITH, & BRIAN SMITH, | ) ) | |
| | ) | |
| Plaintiffs-Appellants, | ) | ON APPEAL FROM THE UNITED |
| | ) | STATES DISTRICT COURT FOR THE |
| v. | ) | WESTERN DISTRICT OF MICHIGAN |
| | ) | |
| KEVIN DYKSTRA, PAUL SMUTZ, JASON PAVLIGE, FRUITPORT CHARTER TOWNSHIP, JOANNA BETH DYKSTRA, ED BOOKER, JOSH BOOKER, WAYNE KAMP, BRIAN KLINGEL, RON MINOR, & SCOTT WENELL, | ) ) ) ) ) ) ) ) | |
| | ) | |
| Defendants-Appellees. | ) | |
| | ) | |
| | ) | |

**Before: CLAY and GIBBONS, Circuit Judges, and HOOD, District Judge.**[*]

**JULIA SMITH GIBBONS, Circuit Judge**. This is an appeal from the district court's grant

of summary judgment in a civil rights action brought under 42 U.S.C. § 1983. Plaintiffs alleged that

several police officers and public officials were complicit in the unlawful taking of certain personal

property from their storage unit. The district court rejected plaintiffs' claims and granted summary

---

[*]The Honorable Joseph M. Hood, United States District Judge for the Eastern District of Kentucky, sitting by designation.

judgment in favor of defendants. For the reasons set forth below, we affirm in part and reverse in part.

I.

This case arose out of a dispute between plaintiffs and defendants over the ownership of tools. On October 12, 2004, defendant Kevin Dykstra and plaintiff Stephanie Garcia entered into a purchase agreement in which Garcia agreed to purchase Dykstra's business, True Cuts Lawn Care, LLC ("True Cuts"). Under the terms of the agreement, Garcia agreed to a purchase price of $1.00 for the True Cuts name, business goodwill, and all client lists and assumed the rights to all accounts receivables and certain assets. The agreement did not accurately reflect the nature of the transaction, however. First, Dykstra received $16,500 in cash, not $1.00, for his sale of True Cuts. Second, although the purchase agreement named Stephanie Garcia as the purchaser, she was merely acting as a proxy for her husband, plaintiff Joel Garcia, and plaintiff Brian Smith. Shortly after the signing of the purchase agreement, Joel Garcia and Brian Smith took possession of a number of tools from two locations: 2885 Brooks Road and 2815 Alder, operating on their belief that the tools had been transferred under the purchase agreement. Garcia and Smith eventually transferred the materials to a storage unit at Cloverville Store and Lock, the lease for which was in Smith's name only.

Dykstra, it appears, took a different view of the meaning of the purchase agreement he signed with Stephanie Garcia. Dykstra believed the agreement's reference to "assets" at "said location" was intended to encompass only the paperwork held at his residence at 2815 Alder and not the equipment stored at 2885 Brooks Road, what Dykstra described as his "shop." In December 2004, Dykstra reported the tools taken by Garcia and Smith from 2885 Brooks Road to be stolen. Although Dykstra insisted that Garcia be arrested for the removal of assets from 2885 Brooks Road, Garcia

2

claimed that he and Smith had lawfully accessed the building and that he had paid for the items he removed. The prosecutor's office informed Dykstra that the matter was civil and that criminal charges would not be brought. Although the record is clear that an early determination was made that this dispute was civil in nature, a warrant for Garcia's arrest was issued on May 20, 2005, containing Dykstra's allegation that Garcia had received and concealed stolen property valued at more than $200 but less than $1000, in violation of Mich. Comp. Laws § 750.535(4)(a).[2] Those charges were subsequently dismissed.

On Saturday, July 16, Dykstra returned to the storage site, and with the permission of Jerry Lundberg, the owner of the Store and Lock, left his truck at the storage facility in order to discourage anyone from moving the tools out of the unit over the weekend. Dykstra's wife, defendant Joanna Beth Dykstra, leased a storage unit at the Store and Lock to provide a place from which Dykstra could watch the unit in which he believed his property was held. By leasing the unit, the Dykstras also were given the access code for the gate surrounding the units at the Store and Lock. Dykstra and his wife spent most of Sunday, July 17, conducting "surveillance" at the facility.

Early Monday morning, July 18, Garcia and Smith arrived at the Store and Lock, but, according to Dykstra, they did not enter the storage unit about which Dykstra was concerned. Dykstra claimed that a police officer came shortly thereafter and inquired into the reason for his presence at the storage complex. Dykstra responded that he had permission from Lundberg to be at the facility and that he was keeping watch over his tools. The officer informed Dykstra that the police had received a complaint from Garcia and Smith regarding his presence. Smith believed that Dykstra was stalking him, following him, and taking pictures of him. He made repeated complaints

---

[2]The warrant was issued only for Garcia's alleged receipt and concealment of a ramp trailer.

to the police concerning Dykstra's presence near his storage unit. After the arrival and departure of a second officer, Lundberg arrived and told Dykstra that he could no longer be on the property "harassing" Garcia and Smith and had to leave. Dykstra complied but later in the day returned to an area adjoining Lundberg's property.

At some later point on July 18, Dykstra contacted Ron Cooper, the Fruitport Charter Township Supervisor. Cooper called Paul Smutz, the chief of police, and asked that Smutz call Dykstra to see if he needed any assistance. Shortly thereafter, Dyskstra called Smutz. Although Dykstra and Smutz agreed that they had more than one conversation on July 18, they offered differing testimony on the substance of those conversations. According to Dykstra, after he informed Smutz that he discovered the rest of his allegedly stolen property, Smutz assured him that he was going to speak to the prosecutor's office to attempt to secure a "warrant or something" to retrieve the tools. Dykstra testified that Smutz then told him that there would be no arrest warrants issued if Dykstra went to the Store and Lock to collect his tools himself. When Dykstra inquired into whether it would therefore be appropriate to take independent steps to retrieve his property, Smutz responded: "Well, it would be better with a warrant, but as long as you have more proof that those tools are yours than they have that they're theirs, you're all right doing it." Dykstra also testified that Smutz encouraged him to retain assistance in getting the tools and promised to send Fruitport Township police officers to the scene. Smutz, by contrast, disputed Dykstra's representation that Smutz sought to obtain a search warrant before Dykstra entered the storage unit. He also denied Dykstra's claim that he assured Dykstra that no arrest warrants would issue for the entry into the Smith storage unit.

After being told by Lundberg that he was no longer permitted on Store and Lock's property, Dykstra returned there with at least one other person, defendant Wayne Kamp. In the course of placing a lock on Dykstra's storage unit and inspecting the exterior of Smith's unit to ensure nothing had been removed, Kamp discovered what he believed to be a key to the Smith storage unit. According to Kamp, he observed something shining and told Dykstra that "[i]t looks like it could be a key laying on the ground, it could be."[3] Dykstra relayed this information to Smutz, who said he would look into the matter. It is undisputed that on July 18, Smutz called Dykstra to confirm that he had discovered the key at the Store and Lock, used the key to open the Smith unit, looked inside, saw the tools inside, and secured the unit again. Smutz insisted that he did not go to the Store and Lock and search for the key as a partisan in the dispute but to confirm the veracity of Dykstra's story.

On the evening of July 18, 2005, Dykstra and several of his associates—including defendants Ed Booker, Joshua Booker, Kamp, Brian Klingel, Ron Minor, and Scott Wenell—met at 2885 Brooks Road. Dykstra testified that defendant Jason Pavlige, of the Fruitport Charter Township Police Department, was also present, although Pavlige denied meeting Dykstra there. During a brief conversation following Pavlige's arrival at 2885 Brooks Road, Dykstra told the officer that the group did not require assistance in collecting the tools but Pavlige could wait by the road with Dykstra. The officer led the group by car to the Store and Lock. Dykstra testified that Kamp punched in the pass code to gain access to the area where the storage units were located. While the rest of the group entered the property and loaded the tools, Dykstra and Pavlige waited by Pavlige's car. When Ed

---

[3]Kamp testified that he discovered the key several days before the events at issue in this litigation, not July 18. This disparity is immaterial.

Booker sought to confirm that they were permitted to retrieve the tools, Pavlige gestured in the affirmative by nodding. It is undisputed that Pavlige neither entered the gate nor rendered assistance in physically removing the items from the Smith unit. After the tools were loaded, the group took them back to 2885 Brooks Road.

Upon their discovery on July 19, 2005, that items were removed from the storage unit at Store and Lock, Garcia claimed that he and Smith attempted to file a police report, but the officers at the scene refused to take a report and directed them to contact Smutz. Smutz informed Dykstra that plaintiffs had complained that the padlock on their storage unit had been removed and asked if Dykstra's group had used bolt cutters to remove it. Dykstra responded they had not, and when he inquired about the reason for Smutz's concern, Smutz told him that Lundgren was upset and that Smutz could be blamed for any fallout. After that exchange, Smutz refused to communicate with Dykstra further about the matter.

On August 10, 2005, Joel Garcia, Stephanie Garcia, Brian Smith, and his wife Christina Smith filed suit in the United States District Court for the Western District of Michigan, seeking relief under 42 U.S.C. § 1983 for alleged violations of the Fourth Amendment and raising state-law claims for unlawful conversion and civil conspiracy.[4] In an amended complaint filed December 15, 2005, appellants provided a more detailed factual account of the basis for their claims. As to their civil rights claim, appellants alleged that Fruitport Township police officials and Dykstra and his associates together violated their Fourth Amendment rights to be free from unreasonable searches and seizures when they retrieved what Dykstra thought to be his tools from the Store and Lock unit.

---

[4]Plaintiffs also alleged a Fourteenth Amendment due process violation, but that claim was dismissed without objection.

On July 28, 2006, in response to an order to show cause, plaintiffs agreed to the dismissal of their claims against the Fruitport Charter Township.

On the motion of defendants Fruitport Charter Township, Pavlige, and Smutz and in response to its order to show cause, the district court granted summary judgment on plaintiffs' claims. In an order dated August 23, 2005, the district court concluded, as an initial matter, that only Brian Smith had standing to pursue a Fourth Amendment claim against defendants because his name alone appeared on the Store and Lock lease. As to Pavlige and Smutz, the district court ruled that both officers were entitled to qualified immunity from suit. The district court likewise dismissed municipal defendant Fruitport Charter Township. Having dismissed plaintiffs' § 1983 against the police officers and the municipality, the district court declined to exercise supplemental jurisdiction over plaintiffs' state-law claims. This timely appeal followed.

II.

A.

We review a district court's decision to grant summary judgment *de novo*. *Pagan v. Fruchey*, 492 F.3d 766, 770 (6th Cir. 2007) (citation omitted). Summary judgment may be granted only if there are no genuine issues of material fact and one party is entitled to a judgment as a matter of law. Fed. R. Civ. P. 56(c). The moving party bears the initial burden of demonstrating the absence of any genuine issue of material fact, and all inferences should be made in favor of the non-moving party. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). To support its motion, the moving party may show "that there is an absence of evidence to support the nonmoving party's case." *Id*. at 325.

Once the moving party satisfies its initial burden, the burden shifts to the nonmoving party to set forth specific facts showing a triable issue of material fact. *Matsushita Elec. Indus. Co. v.*

7

*Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986). "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient [to defeat a motion for summary judgment]; there must be evidence on which the jury could reasonably find for the plaintiff." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986). In reviewing a district court's decision to grant summary judgment, we view all the facts and the inferences drawn therefrom in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co.*, 475 U.S. at 587.

B.

i. Standing

Citing the district court's decision, defendants contend that only Brian Smith is permitted to pursue a Fourth Amendment claim because the storage unit in question was leased in his name. However, the Supreme Court has held "that capacity to claim the protection of the Fourth Amendment depends not upon a property right in the invaded place but upon whether the person who claims the protection of the Amendment has a legitimate expectation of privacy in the invaded place." *Rakas v. Illinois*, 439 U.S. 128, 143 (1978).

Defendants do not otherwise challenge plaintiffs' assertion that all four of them stored property in the Store and Lock unit, and therefore, all four plaintiffs may pursue a Fourth Amendment challenge to Smutz's entry into the unit. Moreover, the district court was incorrect in suggesting that, because plaintiffs may not have had a viable property interest in the tools, they may not advance a Fourth Amendment claim. "The legality of a person's possession cannot be the lynchpin of their Fourth Amendment standing." *United States v. Carnes*, 309 F.3d 950, 960 (6th Cir. 2002). In any event, there is no dispute that plaintiffs legally retained an interest in the storage unit and could have reasonably expected that it would not be entered. *See id.* at 959-60 (rejecting

8

government's argument that defendant had no expectation in certain tapes because their content was illegally obtained where "tapes themselves were not stolen, nor was the briefcase in which they were found").

## ii. Liability of Private Defendants Under § 1983

Although the parties and the district court largely ignored the status of the private defendants[5] for the purposes of plaintiffs' § 1983 suit, there is an initial question of whether they may be held liable under a statute directed at constitutional violations at the hands of the government. Section 1983 is directed at actions taken pursuant to governmental authority, and "does not, as a general rule, prohibit the conduct of private parties acting in their individual capacities." *Lindsey v. Detroit Entm't, LLC*, 484 F.3d 824, 827 (6th Cir. 2007) (citing *Lugar v. Edmondson Oil Co., Inc.*, 457 U.S. 922, 947 (1982)); *Tahfs v. Proctor*, 316 F.3d 584, 590 (6th Cir. 2003). Private actors may be liable as agents of the government when their conduct is "fairly attributable to the state." *Romanski v. Detroit Entm't, LLC*, 428 F.3d 629, 636 (6th Cir. 2005) (internal quotation marks omitted). Private conduct is actionable under § 1983 if it is: (1) the exercise of a public function; (2) the result of state compulsion; or (3) a result of a symbiotic relationship or nexus between the government and a private party. *See Chapman v. Higbee Co.*, 319 F.3d 825, 833 (6th Cir. 2003). In the instant case, the symbiotic relationship or nexus framework is the sole framework potentially applicable to plaintiffs' claims.[6]

---

[5]The private defendants are Kevin Dykstra, Joanna Beth Dykstra, Ed Booker, Josh Booker, Wayne Kamp, Brian Klingel, Ron Minor, and Scott Wenell.

[6]"The public function test requires that the private entity exercises powers which are traditionally exclusively reserved to the state . . . . The state compulsion test requires proof that the state significantly encouraged or somehow coerced the private party, either overtly or covertly, to take a particular action so that the choice is really that of the state." *Tahfs*, 316 F.3d at 591 (quoting

"Under the symbiotic [relationship] or nexus test, a [§] 1983 claimant must demonstrate that there is a sufficiently close nexus between the government and the private party's conduct so that the conduct may be fairly attributed to the state itself." *Id.* at 834. The nexus test "requires a sufficiently close relationship (*i.e.*, through state regulation or contract) between the state and the private actor so that the action taken may be attributed to the state." *Ellison v. Garbarino*, 48 F.3d 192, 195 (6th Cir. 1995). Dykstra and his associates do not qualify as state actors under this definition. Other than their status as residents of Fruitport Charter Township, there is no evidence that the private defendants in this case have the type of intimate connection with the government necessary to attribute their actions to the state. Defendants' conduct was the product of the independent initiative of Dykstra and absent his actions as a catalyst, the challenged activities would not have occurred. Thus, plaintiffs cannot demonstrate that the state was "so intimately involved in the challenged private conduct" that their actions could be classified as state action for the purposes of § 1983. *See Wolotsky v. Huhn*, 960 F.2d 1331, 1335 (6th Cir. 1992). For the foregoing reasons, we affirm the dismissal of plaintiffs' § 1983 claim as to the private defendants.

### iii. Claims Under § 1983 Against Smutz and Pavlige

Section 1983 provides a private right of action for those persons subject to a deprivation of the "rights, privileges or immunities" guaranteed under the Constitution when that deprivation is effected by a person operating "under color of any statute, ordinance, regulation, custom, or usage" of a governmental entity. 42 U.S.C. § 1983. "[G]overnment officials sued in their individual capacities may be held liable under § 1983 when they violate constitutional rights that are 'clearly

---

*Ellison v. Garbarino*, 48 F.3d 192, 195 (6th Cir. 1995)).

established.'" *Mitchell v. McNeil*, 487 F.3d 374, 376 (6th Cir. 2007) (quoting *Saucier v. Katz*, 533 U.S. 194, 201 (2001)) .

a. Lawsuit Against Smutz and Pavlige in their Individual Capacities

Although it analyzed the § 1983 claims against Officers Smutz and Pavlige on the merits, the district court also stated that Smutz and Pavlige were not sued in their individual capacities. We apply a "course of proceedings" test in analyzing whether the defendants received notice that the plaintiffs intended to subject them to personal liability. *Moore v. City of Harriman*, 272 F.3d 769, 772 (6th Cir. 2001) (*en banc*). As the *Moore en banc* court explained:

> The "course of proceedings" test considers such factors as the nature of the plaintiff's claims, requests for compensatory or punitive damages, and the nature of any defenses raised in response to the complaint, particularly claims of qualified immunity, to determine whether the defendant had actual knowledge of the potential for individual liability. . . . The test also considers whether subsequent pleadings put the defendant on notice of the capacity in which he or she is sued. We are mindful of the timing of subsequent filings not, as the officers suggest, because they must be filed practically contemporaneous to the opinion, but rather to determine whether the parties are still in the early stages of litigation. This ensures both fairness to defendants, *Wells*'s[7] first concern, and the resolution of any jurisdictional problems at an early stage, *Wells*'s second concern.

272 F.3d at 772 n.1.

The complaint and amended complaint do not specify in either the caption or the text that Smutz and Pavlige are named in their individual capacities. In the portion of the complaints describing the parties, the allegation is that "Smutz and Pavlige are Police Officers of the township and at all times mentioned in this Complaint were acting under color of law and color of their authority as Police Officers of the Township." The amended complaint, like the original complaint, alleges a § 1983 claim and several state claims against all defendants collectively and prays for

---

[7] *Wells v. Brown*, 891 F.2d 591 (6th Cir.1989).

11

compensatory damages on each claim against defendants as a group without mentioning any defendant by name. Smutz and Pavlige, however, assert the defense of qualified immunity in both their answer and their amended answer.

In *Moore*, where our *en banc* court held that the defendant police officers were on notice they were being sued as individuals, the complaint provided some indication that the officers were sued in their individual capacity and the plaintiff's response to the defendants' motion to dismiss "clarified any remaining ambiguity" as it stated the officers were sued in their individual capacities. 272 F.3d at 773-74. In contrast, in *Shepherd v. Wellman*, this court held that the defendant lacked notice he was being sued in his individual capacity because the only possible indication that the defendant was being sued in his individual capacity was a request for monetary damages. 313 F.3d 963, 968-69 (6th Cir. 2002).

That Smutz and Pavlige asserted a qualified immunity defense in both the answer and the amended answer distinguishes this case from *Shepherd*, making it more factually similar to *Moore.* The qualified immunity defense shows that they were in fact on notice of the possibility of an individual capacity § 1983 claim by the time they filed both the original and the amended answer. *See Linsdsay v. Bogle,* 92 F. App'x 165, 169 (6th Cir. 2004) (stating that "the assertion of a qualified-immunity defense (even a *contingent* qualified-immunity defense) indicates that the defendants were aware they could be held personally liable"); *Biggs v. Meadows*, 66 F.3d 56, 61 (4th Cir. 1995) ("Because qualified immunity is available only in a personal capacity suit . . . the assertion of that defense indicates that the defendant interpreted the plaintiff's action as being against him personally."). Thus, the demand for money damages, along with something more, here the qualified

12

immunity defense asserted in the answer and amended answer, demonstrates that Smutz and Pavlige were aware of potential liability in their individual capacities.

### b. The § 1983 Claim Against Smutz and Pavlige on the Merits

An important preliminary issue is whether Pavlige and Smutz may be held responsible for the actions of Dykstra and his associates. Section 1983, by its terms, requires that any alleged constitutional violation be taken under color of state law, either by government actors or private individuals acting as agents of the state. Government officials typically may not be called to answer for the actions of private parties, and, thus, in the instant case, the relevant question is did Pavlige and Smutz "become so entangled in [Dykstra's] private self-help remedy that they may be held to answer under [§] 1983?" *Meyers v. Redwood City*, 400 F.3d 765, 771 (9th Cir. 2005). The Sixth Circuit "has held that an officer's mere presence at the scene to keep the peace while parties carry out their private repossession remedies does not render the repossession action that of the state." *Revis v. Meldrum*, 489 F.3d 273, 290 (6th Cir. 2007). In *United States v. Coleman*, 628 F.2d 961 (6th Cir. 1980), the Sixth Circuit ruled that "where state involvement in private action constitutes no more than acquiescence or tacit approval, the private action is not transformed into state action even if the private party would not have acted without the authorization of state law. . . . [T]he actions of a private party will not be attributed to the state unless the state actually compels the action." *Id.* at 964. "As a general rule, mere presence at the scene of a search, without a showing of direct responsibility for the action, will not subject an officer to liability." *Ghandi v. Police Dep't of Detroit*, 747 F.2d 338, 352 (6th Cir. 1984); *see also Hall v. Shipley*, 932 F.2d 1147, 1154 (6th Cir. 1991).

### i. Pavlige

Viewing the facts in the light most favorable to plaintiffs, there is inadequate evidence from which to conclude that Pavlige was sufficiently involved in the activities of Dykstra and his associates to make him liable for their activities under § 1983. Pavlige's undisputed testimony was that he was informed by his supervisor, Smutz, that he might receive a call via dispatch concerning Dykstra's situation and that he would need to respond to that call to serve as a peace officer while Dykstra took tools from the Store and Lock unit. Pavlige testified that his role, as he understood it based upon his conversation with Smutz, was to act as an observer and to ensure that no disputes broke out. Even assuming, as Dykstra testified, that Pavlige met the defendants at 2885 Brooks before traveling to the Store and Lock, Pavlige's presence, standing alone, does not constitute the sort of active state involvement or compulsion that would render Pavlige liable for defendants' actions. At most, the record establishes that Pavlige arrived at 2885 Brooks and, according to Dykstra, discussed what was going to happen. Nowhere is there reliable evidence that Pavlige assisted in coordinating the activities of July 18, that he encouraged defendants' actions in any material way, or that he rendered actual assistance in removing tools from the Smith unit. *See Coleman*, 628 F.2d at 964 (finding no state action where "police neither encouraged nor directed [the private party] to repossess the truck in a particular manner"; "[t]heir presence at the scene was not an indispensible prerequisite for repossession of the truck" but was "in furtherance of their official duties").[8] We affirm the dismissal of plaintiffs' § 1983 claim against Pavlige.

---

[8]The disputed ownership of the tools does not affect the analysis of this issue. To the extent that Dykstra incorrectly believed that he retained an ownership interest in the tools and, thus, had no legitimate repossession rights, plaintiffs' action is in tort, not the federal civil rights statute. *See Barrett v. Harwood*, 189 F.3d 297, 304 (2d Cir. 1999) (finding no state action where police officer stood by during repossession and stating that "whatever deprivation of rights the [plaintiffs] may have suffered when their truck was repossessed may not be vindicated in a federal civil rights suit, but may be asserted under New York tort law in state court. If the [plaintiffs] can prove that the

14

## ii. Smutz

The analysis as to Smutz is somewhat different, for he took at least two steps that could conceivably be deemed state action subject to § 1983. First, according to Dykstra, Smutz promised him that he would not be prosecuted for taking back the tools and that Smutz would attempt to secure a search warrant for the Smith unit. Second, Smutz personally traveled to the Store and Lock to confirm the truth of Dykstra's claim that his tools were located in a storage unit there and did so by using a key to open the unit and look inside.

Smutz's promises to Dykstra likely do not rise to the level of active state involvement that would create liability under § 1983 for the same reasons that Pavlige's presence at the Store and Lock could not make him responsible for the actions of the private defendants. Even assuming the truth of Dykstra's account, that Smutz guaranteed him legal protection and that Dykstra would not have taken the steps he did without police protection, there is no evidence of the sort of governmental encouragement or compulsion that would otherwise implicate state actors in a private repossession effort. *See Coleman*, 628 F.2d at 964. We affirm the dismissal of plaintiffs' § 1983 claim as it relates to Smutz's passive involvement in the private defendants' removal of items from the Store and Lock.

When Smutz traveled to the Store and Lock and opened the storage unit to observe the contents, however, he operated in an active, not passive, capacity and took those steps in his position as a governmental official. Thus, the opening of the unit was state action, and that prerequisite for § 1983 liability is satisfied. Smutz may nevertheless be entitled to qualified immunity from suit

---

initial seizure of the truck was wrongful, they might be able to pursue an action for damages against [defendants] for tortious conversion and seek an order requiring its return . . . . ").

15

"insofar as [his] conduct [did] not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). A court determining whether a defendant is entitled to qualified immunity must engage in a two-step analysis. The court must first consider whether "[t]aken in the light most favorable to the party asserting the injury, do the facts alleged show the officer's conduct violated a constitutional right?" *Saucier v. Katz*, 533 U.S. 194, 201 (2001). If no violation occurred, no further inquiry is necessary. *Id.* However, should the court find evidence of a constitutional violation, it must then determine whether the right at issue was "clearly established." *Id.* A plaintiff bears the burden of proving that a governmental defendant is not entitled to qualified immunity. *Garretson v. City of Madison Heights*, 407 F.3d 789, 798 (6th Cir. 2005).

Defendants argue that Smutz's conduct did not constitute a search under the Fourth Amendment, and, therefore, plaintiffs are unable to satisfy the necessary first prong of the qualified immunity test. Whether an officer's conduct qualifies as a search for Fourth Amendment purposes turns on a two-pronged inquiry: (1) has the individual "manifested a subjective expectation of privacy in the object of the challenged search?"; and (2) "is society willing to recognize that expectation as reasonable?" *California v. Ciraolo*, 476 U.S. 207, 211 (1986).

It is, first, clear that plaintiffs demonstrated a subjective expectation of privacy in the items contained in the locked storage unit. By placing the tools inside the storage unit and securing the unit with a padlock, plaintiffs demonstrated an intent to keep the contents of the unit "free from public view." *United States v. Lyons*, 898 F.2d 210, 213 (1st Cir. 1990).[9] The remaining question

---

[9]Defendants argue that plaintiffs retained no reasonable expectation of privacy in the storage unit because the key to the unit was "abandoned." First, the evidence in the record provides no explanation for the key's location on the ground, and, thus, no support for defendants' claim that it

16

is, thus, whether plaintiffs' expectation was objectively reasonable. In assessing this question, the district court relied upon the Sixth Circuit's holding in *United States v. Salgado*, 250 F.3d 438 (6th Cir. 2001), to reject plaintiffs' claim. There, a police office discovered a key in a car parked outside of an apartment complex. *Id.* at 455. Believing that it might be a key to a suspect's apartment, the officer proceeded to the door of an apartment and placed the key in the lock to determine whether the key would unlock the door. *Id.* The key worked, but the officer neither opened the door nor entered the apartment. *Id.* Adopting the district court's conclusion that no search had occurred, the court of appeals stated that "the mere insertion of a key into a lock, by an officer who lawfully possesses the key and is in a location where he has a right to be, to determine whether the key operates the lock is not a search." *Id.* at 456 (citing *United States v. DeBardeleben*, 740 F.2d 440, 445 (6th Cir. 1984)). *Salgado*, while helpful, is not dispositive of the instant case. Here, the uncontested evidence establishes that Smutz did not merely use the key to ensure that it would open the lock on the storage unit. Rather, Smutz also opened the storage unit and looked inside to examine the contents. This is a distinction of significance. Although an individual may not maintain a legitimate expectation of privacy in the lock on a door on the theory that a lock exposed to a public hallway is available to testing by anyone, *see id.* at 456-57, he may reasonably expect that the contents of a closed, locked storage unit within a gated storage complex will remain free from public inspection. In opening and visually examining the contents of the storage unit, Smutz entered a

---

was abandoned rather than simply dropped inadvertently. Plaintiffs' obvious use of the storage unit strongly suggests that this is a more likely reason for the key's presence on the ground. Second, even if the key was "abandoned" for Fourth Amendment purposes, this has little, if any, effect on the plaintiffs' expectation of privacy in the locked storage unit that was indisputably not abandoned.

17

sphere in which plaintiffs maintained a reasonable expectation of privacy and, thus, performed a search.

Because Smutz's actions constituted a search, they fall under the Fourth Amendment rubric governing inspections by the police. Searches effected without a warrant are presumptively unreasonable and violative of the Fourth Amendment's mandate that all governmental searches must be reasonable. *See, e.g.*, *United States v. Hudson*, 405 F.3d 425, 441 (6th Cir. 2005). Where an individual consents to a search, however, a warrant is unnecessary. *See Georgia v. Randolph*, 547 U.S. 103, 109 (2006); *Hudson*, 405 F.3d at 441 (noting that an officer with consent to search requires neither a warrant nor probable cause to carry out the search). The consent exception to the warrant requirement extends "even to entries and searches with the permission of a [co-owner] whom the police reasonably, but erroneously, believe to possess shared authority. . . ." *Randolph*, 547 U.S. at 109. In defense of Smutz's actions, defendants argue that Smutz possessed "numerous indicia of Dykstra's common ownership" upon which he "objectively relied . . . in concluding that Dykstra had authority to give his consent to a 'search.'" Defendants have the burden of demonstrating the reasonableness of Smutz's belief that Dykstra possessed apparent authority to consent to a search. *Illinois v. Rodriguez*, 497 U.S. 177, 181 (1990).

The record does not support defendants' claim that Smutz reasonably believed that Dykstra had authority to permit a search of the storage unit. Dykstra informed Smutz on July 18 that he had found his missing tools in a storage unit at the Store and Lock. The record contains no mention by Dykstra to Smutz that he had any previous connection to the unit prior to observing his tools there.[10]

---

[10]Smutz had a conversation with Garcia earlier in the day in which Garcia told him that Dykstra was trying to take property from Garcia's storage unit.

When Dykstra informed Smutz that "somebody saw a piece of metal that might possibly be a key," Smutz agreed to go to the Store and Lock and confirm that Kamp had in fact observed a key. Before proceeding, Smutz asked Dykstra, "Well, do you know it is a key for that door?" Dykstra replied that he had "no idea."

Although Smutz claimed to have relied upon Dykstra's awareness of the location of the key in concluding that Dykstra could authorize entry into the storage unit, it is clear from Dykstra's testimony that he lacked the pertinent information relating to the key that one would reasonably expect an owner to possess, including whether or not the key would open a particular door. At the very least, Dykstra's account was sufficiently questionable to activate Smutz's obligation to inquire further before proceeding with a search based on consent where the source of the authority for that consent is not clear. *See, e.g.*, *United States v. Waller*, 426 F.3d 838, 847 (6th Cir. 2005) ("In addition to the Supreme Court's indication in *Rodriguez*, and this court's holding in [*United States v.*] *McCoy*, [Nos. 97-6485, 97-6486, 97-6488, 1999 WL 357749 (6th Cir. May 12, 1999)], a number of other courts have also recognized an officer's duty to inquire in ambiguous situations."). As the court observed in *Waller*,

> The government cannot establish that its agents reasonably relied upon a third party's apparent authority if agents, faced with an ambiguous situation, nevertheless proceed without making further inquiry. If the agents do not learn enough, if the circumstances make it unclear whether the property about to be searched is subject to mutual use by the person giving consent, then warrantless entry is unlawful without further inquiry.

*Id.* at 846 (internal quotation marks omitted). The substance of the communcations between Dykstra and Smutz on July 18 constitute "surrounding circumstances" that would prompt a reasonable person not to act upon Dykstra's claims without further inquiry. *Rodriguez*, 497 U.S. at 188. Nevertheless,

19

Smutz opened the door to the storage unit and undertook an examination of the interior without any express claim from Dykstra that he had an ownership interest in the unit or any information about how Dykstra happened to know about the location of the key. Smutz also failed to ascertain why, if Dykstra was a mutual possessor, he could not confirm that the key belonged to that unit or why Dykstra would be concerned about the presence of his tools in a unit in which he had a partial property interest. Thus, defendants have failed to show that Smutz's warrantless search of the storage unit was excused by the consent of an individual possessing actual or apparent authority to empower Smutz to search the unit. Because Smutz's actions do not qualify for the consent exception to the warrant requirement, his search of the storage unit was unlawful.

Smutz is nevertheless entitled to the protection of qualified immunity unless the right he violated was clearly established at the time of the violation. The appropriate inquiry on this issue is "whether a reasonable official in the defendant's position could have believed that his conduct was lawful, judged from the perspective of the reasonable official on the scene." *Gardenhire v. Schubert*, 205 F.3d 303, 311 (6th Cir. 2000). "When determining whether a right is 'clearly established," this Court must look "first to decisions of the Supreme Court, then to decisions of this Court and other courts within our circuit, and finally to decisions of other circuits.'" *Id.* (citing *Daugherty v. Campbell*, 935 F.2d 780, 784 (6th Cir.1991)). The Supreme's Court decision in *Brosseau v. Haugen*, 543 U.S. 194, 199-200 (2004), set forth two means by which a § 1983 plaintiff may show that a right was clearly established. A plaintiff may establish that a violation "was sufficiently obvious under the general standard of constitutional care that the plaintiff need not show a body of materially similar case law" or prove that an officer "fail[ed] to adhere to a particularized body of precedent that squarely governs the case." *Lyons v. City of Xenia*, 417 F.3d 565, 579 (6th Cir. 2005) (citing

*Brosseau*, 543 U.S. at 199-200) (internal quotation marks and brackets omitted). Plaintiffs do not point to any factually analogous case law supporting their claim and instead rely heavily upon the well-established tenet of Fourth Amendment jurisprudence that a government official may not enter the property of a private citizen absent a warrant supported by probable cause. Defendants respond that Smutz is entitled to qualified immunity because under *Salgado*, the mere insertion of a key into a lock does not qualify as a search, and Smutz could not otherwise have known that his conduct was unlawful.

Preliminarily, at the time of Smutz's actions, a search subject to Fourth Amendment scrutiny was defined as a "the government[al] violat[ion of] a subjective expectation of privacy that society recognizes as reasonable." *Kyllo v. United States*, 533 U.S. 27, 33 (2001). Identifying the activities falling within this category is not "simple." *See id.* at 31. The reasonableness of an individual's expectation of privacy in a closed, locked storage unit within a gated storage complex, however, is not the type of close question that might yield itself to an officer's reasonable misapprehension of clearly established law. *See United States v. Bailey*, 628 F.2d 938, 943-44 (6th Cir. 1980) (concluding that search occurred when government placed beeper inside drum of chemicals placed by defendants, among other places, in a "locked storage compartment"); *cf. United States v. Jacobsen*, 466 U.S. 109, 129 (1984) (White, J., concurring) ("The Court . . . has made clear that the Fourth Amendment provides protection to the owner of every container that conceals its contents from plain view and does not otherwise unmistakably reveal its contents.") (internal quotation marks omitted).

As to Dykstra's authority to consent, at the time of the events relevant to this litigation, three principles of Fourth Amendment jurisprudence were well-established, either by Supreme Court

precedent or Sixth Circuit case law. First, a warrantless search is presumptively unreasonable under the Fourth Amendment. *Katz*, 389 U.S. at 357; *Hudson*, 405 F.3d at 441. Second, the absence of a warrant may be excused in the presence of consent, either from an individual with actual authority to permit a search or where a third party has apparent authority to consent. *Rodriguez*, 497 U.S. at 183-84. Finally, when the police seek to conduct a search on the basis of apparent authority and the surrounding circumstances make the issue of authority ambiguous, an officer is obligated to inquire further rather than proceed with the search. As the Court explained in *Rodriguez*, "[e]ven when the invitation [to search] is accompanied by an explicit assertion that the person [has authority to consent], the surrounding circumstances could conceivably be such that a reasonable person would doubt its truth and not act upon it without further inquiry." *Id.* at 188. If the facts available to the officer would not support the belief "that the consenting party had authority over the premises," then "warrantless entry without further inquiry is unlawful unless authority actually exists." *Id.* at 188-89; *see also Waller*, 426 F.3d at 847 (citing *Rodriguez* and collecting cases predating the instant litigation recognizing a duty to inquire where authority to consent to a search is unclear).

As previously discussed, the facts of which Smutz was aware when Dykstra informed him of the storage unit did not clearly confirm Dykstra's potential interest in the Store and Lock unit. Dykstra had no information about why the key was located on the ground in front of the unit. He expressed uncertainty about whether what Kamp observed was the key to the unit or, indeed, if it was a key at all. Moreover, Dykstra did not clearly explain why he was concerned about the tools being in a storage unit to which he had lawful access or why he required assistance in retrieving the tools if he had access to the unit. In sum, Dykstra's account of both his discovery of the tools in the storage unit and his discovery of the key outside the unit should have raised multiple questions about

22

his potential interest in the unit and Dykstra's authority to consent to a search. Smutz was, therefore, under the law applicable at the time, obligated to engage in further inquiry concerning Dykstra's apparent authority to consent to a search. His decision to conduct the search without this inquiry was a violation of clearly established law.

Because the governing law at the time of the search gave Smutz "fair warning" that his conduct was constitutionally deficient, *see Hope v. Pelzer*, 536 U.S. 730, 740-41 (2002), the district court erred in granting him qualified immunity on plaintiffs' Fourth Amendment claim as it relates to his entry into the storage unit. We affirm the district court's dismissal of plaintiffs' § 1983 claim as to Smutz's passive involvement in the private defendants' removal of items from the Store and Lock and reverse as it relates to his entry into the storage unit.

### iv. Municipal Liability

A municipality cannot be liable for the constitutional torts of its employees on a respondeat superior theory. *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 691 (1978). A municipality is liable only if the plaintiff establishes that the municipality engaged in a "policy or custom" that was the "moving force" behind the deprivation of the plaintiff's rights. *Id.* at 694; *see also Doe v. Claiborne County*, 103 F.3d 495, 507 (6th Cir. 1996) ("Under *Monell*, the [defendants] cannot be found liable unless the plaintiff can establish that an officially executed policy, or the toleration of a custom . . . leads to, causes, or results in the deprivation of a constitutionally protected right.").

The district court dismissed the *Monell* claim against Fruitport Charter Township, explaining that no actual or de facto policy "dictated" the actions of Officers Smutz and Pavlige. Plaintiffs agreed to dismissal of this defendant in response to an order to show cause issued by the district court and have abandoned this claim on appeal. "Issues which were raised in the district court, yet

not raised on appeal, are considered abandoned and not reviewable on appeal." *Renkel v. United States*, 456 F.3d 640, 642 n.1 (6th Cir. 2006) (quoting *Robinson v. Jones*, 142 F.3d 905, 906 (6th Cir. 1998)).  Accordingly, we will not address the *Monell* claim on appeal.

v. State Law Claims

Plaintiffs contend, finally, that the district court erred in dismissing their remaining state law claims after granting summary judgment on their § 1983 claim.  By statute, a district court may decline to exercise supplemental jurisdiction under 28 U.S.C. § 1367(a) where it has "dismissed all claims over which it has original jurisdiction. . . ."  28 U.S.C. § 1367(c)(3).  "Supplemental jurisdiction is a doctrine of discretion, not of plaintiff's right," and the decision to dismiss supplemental claims is subject to reversal only if the district court abused its discretion in dismissing the claims. *Habich v. City of Dearborn*, 331 F.3d 524, 535 (6th Cir. 2003) (internal quotation marks omitted).  The district court dismissed plaintiffs' state law claims in light of its decision to grant summary judgment on their § 1983 claim.  As we reverse the dismissal of Smutz as to the § 1983 claim, we reverse the district court's dismissal without prejudice of the remaining state law claims.

III.

For the foregoing reasons, we affirm in part and reverse in part the judgment of the district court. We reverse the district court's dismissal of the § 1983 claim against Smutz as it relates to his entry into the storage unit and the dismissal without prejudice of the remaining state law claims and remand for further proceedings.

24